421 A.2d 629

**ALLSTATE INSURANCE COMPANY, Appellant,**

v.

**Delores HEFFNER, Appellee.**

**Homer S. PONTIUS, Administrator of the Estate of Janet A. Pontius, deceased, Appellee,**

v.

**UNITED STATES FIDELITY AND GUARANTY COMPANY, Appellant.**

Supreme Court of Pennsylvania.

Argued April 17, 1980.

Decided Sept. 22, 1980.

448

James M. Marsh, Philadelphia, for Allstate Ins. Co.

Ira Silverstein, Philadelphia, for Delores Heffner.

Richard C. Angino, Harrisburg, for Pennsylvania Trial Lawyers Ass'n and Homer S. Pontius.

Jeffrey A. Less, Philadelphia, for Insurance Federation of Pennsylvania, etc.

F. Lee Shipman, James W. Evans, Harrisburg, for United States Fidelity & Guaranty Co.

## OPINION

NIX, Justice.

Both of these appeals present the question of the extent of benefits available under the Pennsylvania No–Fault Motor Vehicle Insurance Act[1] to the survivors of persons fatally injured in automobile accidents. For the reasons that follow, we will sustain the orders of the Superior Court.

### I.

The husband of appellee, Delores Heffner, was killed when the car he was driving struck a utility pole. No other vehicles or persons were involved in this accident. The deceased was the holder of an Allstate Motor Vehicle Insur-

---

[1] Act of July 19, 1974, P.L. 489, No. 176, 40 P.S. §§ 1009.101 *et seq.* (Supp. 1980–81) hereinafter the Act of the No–Fault Act.

ance Policy which provided him with coverage in accordance with the No–Fault Act. Appellee Heffner applied for benefits under the decedent's Allstate insurance policy, seeking to recover funeral expenses, "survivor's loss" benefits, and "work loss" benefits. These latter two categories are statutorily defined benefits under the Act, and will be discussed below. Appellant, Allstate Insurance Company, agreed to pay both the funeral expenses and the survivor's loss benefits, but denied recovery on the work loss benefits claim. Appellee Heffner subsequently filed a complaint in assumpsit against Allstate seeking to recover the work loss benefits. The Court of Common Pleas of Philadelphia County entered an order granting judgment on the pleadings in favor of Allstate, thereby denying appellee Heffner's claim. The Superior Court reversed the Court of Common Pleas, 265 Pa.Super. 181, 401 A.2d 1160 (1979), holding that work loss benefits were available to Mrs. Heffner.[2] We granted Allstate's petition for allowance of appeal pursuant to 42 Pa.C.S.A. § 724.

Appellee Homer Pontius is the administrator of the estate of Janet A. Pontius, who was killed in an automobile accident. The decedent was insured under an automobile policy issued by appellant, United States Fidelity and Guaranty Company (USF&G), in accordance with the No–Fault Act. USF&G paid the statutory "survivor's loss" benefits to the qualifying survivors, but rejected the estate's claim for "work loss" benefits under the Act. The estate brought suit in the Court of Common Pleas of Dauphin County seeking work loss benefits. That court sustained USF&G's preliminary objections in the nature of a demurrer to the complaint. 100 Dauphin 133 (1978). The Superior Court reversed in an unreported opinion, based solely upon its opinion in the *Heffner* case. We granted USF&G's petition for

2. President Judge Cercone wrote the majority opinion, joined by Judge Hester. Judges Van der Voort and Spaeth joined the majority opinion with the understanding that it did not authorize double recovery. Judge Price noted his dissent. Former President Judge Jacobs and Judge Hoffman did not participate in the consideration or decision of the case.

allowance of appeal and consolidated argument on this case with that on *Heffner*.[3]

## II.

This Court must start from the position that its duty "is to ascertain and effectuate the intention of the General Assembly," so that full effect is given to every provision of a statute, if possible. 1 Pa.C.S.A. § 1921(a) (1980–81 pamphlet).

In enacting the No–Fault Act, the General Assembly expressly declared that "the maximum feasible restoration of all individuals injured and *compensation of the economic losses of the survivors of all individuals killed in motor vehicle accidents on Commonwealth highways, . . . is essential* to the humane and purposeful functioning of commerce." 40 P.S. § 1009.102(a)(3) (emphasis added). Furthermore, "it is hereby declared to be the policy of the General Assembly to establish . . . a statewide system of prompt and *adequate basic loss benefits for motor vehicle accident victims and the survivors of deceased victims*," 40 P.S. § 1009.102(b) (emphasis added). The legislature has provided definitions for the terms with which we must interpret the No–Fault Act.[4] The following definitions con-

3. In addition to the briefs submitted by both sets of appellants and appellees in these cases, we have had the benefit of amicus curiae briefs submitted by the Pennsylvania Trial Lawyers Association on behalf of appellee Heffner, and by the Insurance Federation of Pennsylvania, the National Association of Independent Insurers, and the American Insurance Association on behalf of appellants, Allstate and USF&G.

4. The definitions given by the legislature to the terms of a statute are controlling. As we stated in *Hughes v. Pittsburgh*, 379 Pa. 145, 148, 108 A.2d 698, 699 (1954):

Where, however, the statute or ordinance defines a word or phrase therein the court is bound thereby. In *Sterling v. Philadelphia*, 378 Pa. 538, 542, 106 A.2d 793, 795, Mr. Chief Justice Horace Stern said: ". . . A legislative body may, in a statute or ordinance, furnish its own definitions of words and phrases used therein in order to guide and direct judicial determination of the intendments of the legislation although such definitions may be different from ordinary usage; it may create its own dictionary to be applied to the particular law or ordinance in question. . . ."

tained in Article I are required in order to resolve the issue presently before us:

"*Allowable expenses*" means reasonable charges incurred for, or the reasonable value of (where no charges are incurred), reasonably needed and used products, services, and accommodations for:

(A) professional medical treatment and care;

(B) emergency health services;

(C) medical and vocational rehabilitation services;

(D) expenses directly related to the funeral, burial, cremation, or other form of disposition of the remains of a deceased victim, not to exceed one thousand five hundred dollars ($1,500); and

The term does not include that portion of a charge for a room in a hospital, clinic, convalescent, or nursing home, or any other institution engaged in providing nursing care, and related services, in excess of a reasonable and customary charge for semiprivate accommodations, unless more intensive care is medically required; or any amount includable in work loss, replacement services loss, or survivor's loss.

"*Basic loss benefits*" means benefits provided in accordance with this act for the net loss sustained by a victim, subject to any applicable limitations, exclusions, deductibles, waiting periods, disqualifications, or other terms and conditions provided or authorized in accordance with this act. Basic loss benefits do not include benefits for damage to property. Nor do basic loss benefits include benefits for net loss sustained by an operator or passenger of a motorcycle.

\* \* \* \* \* \*

"*Injury*" means accidentally sustained bodily harm to an individual and that individual's illness, disease, or death resulting therefrom.

\* \* \* \* \* \*

"*Loss*" means accrued economic detriment resulting from injury arising out of the maintenance or use of a

motor vehicle consisting of, and limited to, allowable expense, work loss, replacement services loss, and survivor's loss.

\* \* \* \* \* \*

"*Replacement services loss*" means expenses reasonably incurred in obtaining ordinary and necessary services in lieu of those the victim would have performed, not for income, but for the benefit of himself or his family, if he had not been injured.

\* \* \* \* \* \*

"*Survivor*" means:

(A) spouse; or

(B) child, parent, brother, sister or relative dependent upon the deceased for support.

"*Survivor's loss*" means the:

(A) loss of income of a deceased victim which would probably have been contributed to a survivor or survivors, if such victim had not sustained the fatal injury; and

(B) expenses reasonably incurred by a survivor or survivors, after a victim's death resulting from injury, in obtaining ordinary and necessary services in lieu of those which the victim would have performed, not for income, but for their benefit, if he had not sustained the fatal injury, reduced by expenses which the survivor or survivors would probably have incurred but avoided by reason of the victim's death resulting from injury.

"*Victim*" means an individual who suffers injury arising out of the maintenance or use of a motor vehicle; "*deceased victim*" means a victim suffering death resulting from injury.

\* \* \* \* \* \*

"*Work loss*" means:

(A) loss of gross income of a victim, as calculated pursuant to the provisions of section 205 of this act; and

(B) reasonable expenses of a victim for hiring a substitute to perform self–employment services, thereby mitigating loss of income, or for hiring special help, thereby enabling a victim to work and mitigate loss of income.

40 P.S. § 1009.103. (Emphasis added.)

Article II of the Act establishes the right to benefits and imposes monetary ceilings on the amount of benefits recoverable. Specifically, Section 201, in pertinent part, confers the right to receive basic loss benefits to "any victim or any survivor of a deceased victim," if the accident resulting in injury occurs within the Commonwealth.[5] Section 202 enumerates the four types of basic loss benefits as well as their monetary limits: a) *allowable expense limits*, including reasonable professional medical treatment and care, emergency health services, medical and vocational rehabilitation services; and funeral expenses;[6] b) *work loss benefits* ($15,000 maximum);[7] c) *replacement services losses* ($25 per day for one year);[8] and d) *survivors losses* ($5,000 maximum).[9] Section 205, in turn, establishes the method for determining the amount of work loss benefits.[10] The Act requires that benefits be paid monthly as loss accrues. "Loss accrues not when injury occurs, but as allowable expenses, work loss, replacement services loss, or survivor's loss is sustained."[11]

### III.

The crux of the issue presented to us is whether the legislature intended "victims" of motor vehicle accidents to be accorded differing basic loss benefits from those accorded survivors of "deceased victims." Appellants, Allstate and USF&G, contend that the legislature did intend such a distinction. On the one hand, appellants assert that "victims" are entitled to the following basic loss benefits: *allowable expense, work loss*, and *replacement services loss.* On

5. 40 P.S. § 1009.201 (Supp. 1980–81).

6. 40 P.S. §§ 1009.202(a) & 1009.103 (Supp. 1980–81).

7. 40 P.S. §§ 1009.202(b) & 1009.103 (Supp. 1980–81).

8. 40 P.S. §§ 1009.202(c) & 1009.103 (Supp. 1980–81).

9. 40 P.S. §§ 1009.202(d) & 1009.103 (Supp. 1980–81).

10. 40 P.S. § 1009.205 (Supp. 1980–81).

11. 40 P.S. § 1009.106(a)(1) (Supp. 1980–81).

the other hand, appellants maintain survivors of "deceased victims" are only entitled to: *allowable expense* (funeral expenses) and *survivor's loss.* This view has been adopted by four different courts of common pleas [12] but was rejected by the Superior Court in the two cases presently before us.

Appellants support their position by referring to the definition of "victim" contained in section 103. Appellants assert that section 103 differentiates between "victims" and "deceased victims." These terms are defined in the same paragraph which states:

> "Victim" means an individual who suffers injury arising out of the maintenance or use of a motor vehicle; "deceased victim" means a victim suffering death resulting from injury.

40 P.S. § 1009.103

By providing separate definitions for "victim" and "deceased victim," appellants argue that the legislature intended to create two classifications of beneficiaries for purposes of different basic loss benefits.

Furthermore, appellants point out that section 103's definition of "work loss" mentions only the term "victim" and fails to mention either the term "survivor" or "deceased victim." By failing to include "deceased victim" within the definition of "work loss," appellants argue that the legislature intended to provide work loss benefits only to victims who did not die as a result of their injuries.

In its *Heffner* opinion, the Superior Court rejected Allstate's claim that the legislature intended to create two separate and distinct classes of beneficiaries under the Act. After subjecting the proffered "victim–deceased victim" dichotomy to a searching analysis, the Superior Court found it wanting:

12. *See,* opinion of Judge Schmidt in the *Heffner* case (No. 76–3406 Philadelphia County, filed November 28, 1977); the opinion of Judge Morgan in the *Pontius* case [100 Dauphin 133 (1978)]; the opinion of Judge Brown in *Anderson v. Nationwide Ins. Co.* (No. 76–19366 Montgomery County, filed February 24, 1978); and the opinion of Judge Blakely in *Winegart v. State Farm Mutual Automobile Ins. Co.* (No. 77–5–3437 York County, filed April 4, 1978).

Of course, recalling the sentiment with which we began our discussion of the No–Fault Motor Vehicle Insurance Act, it is not surprising to learn that Allstate's argument is cogent so long as one ignores contrary signs of guidance in the Act. For example, as we stated above, in its preamble the Act exclaims its purpose to be, *inter alia*, "the maximum feasible restoration of all individuals injured and compensation of the economic losses of the survivors of all individuals killed in motor vehicle accidents on Commonwealth highways. . . ." Historically, the courts of this Commonwealth have routinely followed this spirit and found coverage for the insured in close or doubtful insurance cases. The tendency has been that if we should err in ascertaining the intent of the legislature or the intendment of an insurance policy, we should err in favor of coverage for the insured. Obviously, to adopt Allstate's interpretation of the Act in the instant case is to give less than generous application to that principle. In addition, although Allstate directed our attention to the definitional dichotomy of "victim–deceased victim" which the Act creates, it has overlooked the impact of the Act's definition of "injury." Section 103 provides: " 'Injury' means accidentally sustained bodily harm to an individual and that individual's illness, disease, or *death* resulting therefrom." [Emphasis added.] Because the Act specifically defines the term "injury," for the purposes of construing the Act, "injury" is a term of art to which we should ascribe precisely the meaning the Act gives it. As one might expect when he analyzes the No–Fault Act, this interpretational truism creates another paradox, a nettlesome impediment for Allstate's position. True, the Act has differentiated victims from deceased victims, but it has not differentiated injuries from fatal injuries. The result is that some sections of the Act which Allstate insists apply only to non–fatal injuries are not so limited by their terms. For example, Section 103 of the Act defines "Loss" as the "accrued economic detriment resulting from *injury . . . consisting of*, and limited to, allowable expense, *work loss*, replacement services loss, *and*

*survivor's loss."* [Emphasis added.] Since injury means death, as well as non–fatal injury, Section 103 can be read to mean that work loss is an accrued economic detriment resulting from death. This implication is fortified by Section 206 of the Act which, in attempting to define "net loss," provides that life insurance proceeds are not to be subtracted from loss in calculating the net loss available to an individual because of injury.

*Id.,* 265 Pa.Super. at 186–188, 401 A.2d at 1162–63 (footnotes omitted, emphasis in original).

Appellants' "victim–deceased victim" dichotomy has also been rejected in a recent treatise that thoroughly examined the Pennsylvania No–Fault Act:

It may be urged that the legislature intended that "deceased victim" would merely be a sub–class of "victim" according to the definitions of the Act and not a separate species of claimants to be treated differently. The legislature specified that "deceased victim means a victim," while it states that "victim means an individual." Surely, if the legislature had intended to separate "victim" and "deceased victim," it would have placed "deceased victim" in its own category in the definitional section (Section 103) in alphabetical order and then it could readily have stated "a deceased victim is an *individual*."

Even in the definition of "survivor's loss," the legislature treats a deceased victim merely as another category of victim. In fact, the terms are used almost interchangeably in Section 103.

" 'Survivor's loss' means the:

(A) loss of income of a *deceased victim* which would probably have been contributed to a survivor or survivors, if such *victim* had not sustained the fatal injury; and

(B) expenses reasonably incurred by a survivor or survivors, after a *victim's* death resulting from injury, in obtaining ordinary and necessary services in lieu of those which the *victim* would have performed, not for income, but for their benefit, if he had not sustained the fatal injury,

reduced by expenses which the survivor or survivors would probably have incurred but avoided by reason of the *victim's* death resulting from injury."

Yet other sections of the No–fault Act, including Sections 110(b), 110(c) and 111(a), use the terms "victim" and "deceased victim" interchangeably.

D. Shrager, ed., The Pennsylvania No–Fault Motor Vehicle Insurance Act, 109–110 (1979). (Emphasis in the original.)

Finally, in *Heffner*, the Superior Court noted that the No–fault automobile insurance laws of several sister states have all expressly denied work loss benefits to the survivors of deceased victims. For instance, Colorado's No–Fault Act expressly states that "disability benefits . . . shall not accrue following the death of the injured person." Colo.Rev.Stat. § 10–4–706(1)(d)(II) (1974). The Connecticut statute specifically notes, "work loss does not include any loss after the death of an injured person" Conn.Rev.Stat. § 38–319(b)(2)(ii) (1977). The Michigan statute likewise unequivocally states: "work loss does not include any loss after the date on which the injured person dies." Mich.Comp.L.Ann. § 500.3107(b) (Supp.1978). *See also*: Nev.Rev.Stat. § 698.070(5) (1977); N.J.Stat.Ann. § 39: 6A–4(b) (1973); N.Y. Insurance Law § 671.1(c) (McKinney Supp.1978); N.D.Cent.Code § 26–41–03(21) (1978). If our legislature had intended to establish different benefits for victims and survivors of deceased victims under the Act, it would have done so in an equally clear and lucid fashion.

Appellants also contend that providing work loss benefits in addition to survivor's loss benefits to the survivors of deceased victims will result in overlapping coverage and double payments. "Survivor's loss", in pertinent part, is defined as "loss of income of a deceased victim which would probably have been contributed to a survivor or survivors. . . ."[13] "Work loss" is defined, in pertinent part, as "loss of gross income of a victim. . . ."[14] Because benefits

13. 40 P.S. § 1009.103 (Supp. 1980–81).

14. 40 P.S. § 1009.103 (Supp. 1980–81).

available under "survivor's loss" and "work loss" overlap in that each includes that portion of the deceased's income as would have been contributed to support his family and dependents, appellants argue that they would be forced to pay twice for the same items of damage or loss. Thus appellants seek to limit the survivors of a deceased victim to the $5,000 ceiling amount of survivors' loss in section 202(d) and would deny all work loss benefits in section 202(b).

Although the Superior Court in *Heffner* recognized the possibility of a double recovery by survivors of a deceased victim, it found that there were more substantial societal benefits to be gained by risking that possibility:

> Thus, the Act leaves us in a quandary. To adopt appellant's argument is to create the likelihood of overlapping or double recoveries for survivors of deceased victims, as well as to compensate them for expenses which were not incurred (e. g., support for a victim who did not survive an accident). On the other hand, to accept Allstate's argument is to ignore countervailing, albeit equivocal, indications that the Act permits such recoveries, and to sublimate the longstanding principle that insurance contracts, as well as remedial legislation relating thereto, should be construed liberally in favor of the insured. 265 Pa.Super. at 188, 401 A.2d at 1163

The possibility of double or overlapping recovery by allowing survivors of deceased victims to recover work loss benefits is disputed in the Shrager treatise on the state No–Fault Act. In discussing the Superior Court's opinion in *Heffner*, it states:

> To what extent does the *Heffner* case permit double recovery for survivor's loss and work losses? The Court unnecessarily seems to assume the likelihood of overlapping recoveries. Section 103 defines "work loss" to include a determination of the accident victim's "gross income." "Survivor's loss" is defined to include "loss of [the very same] income which would probably have been contributed to a survivor or survivors."

Yet, it is probable that the courts will have little difficulty in intermeshing these two forms of basic loss benefits in order to avoid any windfall. In the case of work loss, as already discussed, the Act is simply providing a certain measure of Survival Act damage, on a no–fault basis. The amount will then neatly coordinate with recovery of any excess amount in a tort action under Section 301(a)(4). Similarly, with respect to so much of survivor's loss recovery as represents contributions to survivors, this is simply no–fault wrongful death recovery. There is in fact no duplication of recovery in the same sense that third–party recovery in a wrongful death and survival claim involve different economic loss claims. They do not overlap.

If, for example, a decedent has an earnings loss net of cost of maintenance of $100,000.00 over the balance of his work–life expectancy, $15,000.00 will be recoverable as "work loss" and $5,000.00 will be recoverable as "survivor's loss." The $80,000.00 balance of economic loss must be sought in a tort action.

D. Shrager, ed., *supra* at 112.

Even assuming such potential for double recovery, this fact, in and of itself, does not necessarily evidence a legislative intention to deny "work loss" benefits to survivors. As appellee Pontius points out in his brief, the legislature has allowed double recovery of other benefits under the Act. For example section 203 of the Act concerning Collateral Benefits permits victims to recover their medical expenses from Blue Cross and Blue Shield and then recover the same expenses a second time from the no–fault carrier. It is apparent that the "vice" of double recovery was not foremost in the minds of the legislators when the No–Fault Act was enacted. Consequently, the mere possibility of a double recovery by granting "work loss" benefits to survivors of deceased victims, does not seem contrary to either the express or implied intention of the legislature.

However, we believe that in practice, recovery of survivor's loss and work loss benefits by survivors of deceased

victims, will no more constitute double recovery under the Act than does recovery under analogous wrongful death and survival actions in tort law. *See Pezzulli v. D'Ambrosia*, 344 Pa. 643, 26 A.2d 659 (1942); *First Nat. Bank of Meadville, Pa. v. Niagra Therapy Mfg. Corp.*, 229 F.Supp. 460 (W.D.Pa. 1964); and *Hochrein v. United States*, 238 F.Supp. 317 (E.D.Pa.1965). As we view the Act, the decedent's contribution of income under survivor's loss recovery shall be excluded from the amount recovered under work loss. In this manner, both basic loss benefits will compliment, rather than duplicate each other. It must be kept in mind that the Act sets monetary limits of $15,000 for recovery of work loss benefits and $5,000 of survivor's loss benefits. If actual losses do not reach or exceed these limits, the full amounts of these basic loss benefits need not be paid. The position taken by the Superior Court in *Heffner*[15] is the most cogent approach to the No–Fault Act. The recovery of work loss benefits by survivors of deceased victims best fulfills the legislature's express intention to provide "compensation of the economic losses of the survivors of all individuals killed in motor vehicle accidents" by providing "adequate basic loss benefits [to] . . . the survivors of deceased victims."[16]

The orders of the Superior Court are affirmed.

**15.** Appellees and the Superior Court in *Heffner* have raised the question that a failure to interpret the No–Fault Act to allow survivors of deceased victims to recover work loss benefits would be unconstitutional and a *sub silentio* repealer of the Survival Act, formerly 20 P.S. § 320.601, now 42 Pa.C.S.A. § 8302. In view of today's holding, we need not reach this issue.

**16.** 40 P.S. § 1009.102(a)(3) & (b) (Supp. 1980–81).

KAUFFMAN, J., did not participate in the consideration or decision of this case.

LARSEN, J., concurred in the result.